Sterling Aldridge v. Barrett Law Group Communications stating that or recognizing that the e-commerce platforms are a threat of some sort, in and of itself, that's not problematic, is it? Maybe not in and of itself, but if you look at what we've alleged in a whole, it's not just the statement saying that the e-commerce platforms were going to be a problem. Even within the various levels of commerce, the retailers were telling the manufacturers, hey, if you start supplying these people, we're going to cut off our business with you. They're incorporating contractual restraints to say, hey, you better not, these audit provisions, you better not sell to these e-commerce platforms or we're going to cut you off. And then you've even got five of the defendants who actually did cut FBN off and refused to supply them after they acquired Yorkton. So if you looked at all of these things together as a whole, then you'll see that they were trying to get these guys out of the marketplace. And to your point, Judge Shepard, they did engage in coordinated misinformation campaigns. They created a false narrative about FBN using misinformation to undermine its credibility and deter customers. They used their trade associations, such as CropLife and ARA as an industry platform to coordinate their opposition to the e-commerce platforms to signal the boycott and to reinforce a shared strategy to shut out FBN. The lower court improperly analyzed these techniques individually and dismissed them because there was no agreement on the techniques themselves. But when you take it as a whole, this presents plausible allegations that defendants viewed e-commerce platforms as a threat and acted in parallel, refusing to deal, imposing contractual restraints, spreading coordinated misinformation and auditing to enforce compliance, all with the shared goal of preserving price opacity and shutting out low-cost rivals. The complaint ties these actions to real harm. FBN was blocked from delivering core services and farmers were left with fewer choices and opaque price increases. And both the lower court and the district court took issue with the timing of our boycott allegations, saying that they spanned over too long of a period of time. But if you look, the FBN gained traction in 2014. Just a couple of years later in 2016, Bayer forms its task force to investigate how FBN is affecting its commerce. CHS sends its letters discouraging the use of the e-commerce platforms. The very next year, in 2017, CropLife flagged FBN as a concern and by 2018, CropLife had declared a price war in Iowa as a result of FBN. Also in 2018, ARA urged its members to combat e-commerce platforms. And then by 2018, the defendants were... Those are some things, some communications that would be in the nature of what you and I just talked about. Right, that's correct. And so then, if you look at all of these together, you see that the defendants' actions tracked FBN's rise to success. So as FBN gained popularity and gained traction, the defendants' calls to action against FBN grew louder and the boycott became stronger, ending up with the flat-out refusal of several of these defendants to supply FBN in 2018. We've also alleged plus factors, which the lower court never evaluated, to support a finding that defendants entered into a conscious agreement to boycott e-commerce. We've alleged five plus factors, common motive to conspire, actions against self-interest, opportunities to collude through the trade associations, high market concentration, and prior investigations. The bottom line is that no single plus factor is dispositive, but the conversion of all these factors, shared motive, illogical unilateral behavior, actual communications at trade associations, and prior investigations provide the requisite something more that combined with parallel conduct makes our alleged conspiracy not just possible, but plausible. The lower court also ignored our parallel conduct allegations for several defendants and finding that we did not allege enough information to put each of them on notice of the claims against them. But again, if you look at the complaint as a whole, as you must at this stage, the complaint details specific conduct by each defendant in the conspiracy. For example, we detail specific conduct about Gromark, Nutrien, Winfield, Tencose, and Simplot as being board members in Crop Life A and ARA. You have explicit warnings from Federated and Univar. You've got Cargill's cutoff of FBN after it acquired Yorkton, and you've got Pioneer's records being requested by the Canadian regulators. These are concrete allegations, not general ones, and are sufficient to survive a motion to dismiss because they enhance the plausibility of our allegations. Just to talk a little bit more about our specific allegations of parallel conduct, you've got Federated sending a letter saying that FBN is going to upend their business models. Univar equates using FBN to socialism. We mentioned that CHS sent a letter to Farmers discouraging the use of FBN. The defendants in the lower court also found that the plaintiffs engaged in improper group pleading, but based on all the sufficient allegations that I've discussed with you here this morning, referring to the defendants collectively when you have these specific allegations is not improper. We allege each defendant's participation separately, and it's not impermissible to refer to their collective actions in further of the conspiracy. The complaint should survive if group pleadings and individual pleadings create the plausible inference that each defendant is liable. The complaint should only be dismissed where there are no allegations in the complaint to connect any of the defendants to the conspiracy. Why don't you go over that again? What do you mean that group pleading is okay if there are some individual allegations along with it, but otherwise it's not sufficient? Is that the point you're making? Yes, that's right Judge Coliton. As long as we have specific allegations against each defendant in the complaint that puts them on notice of what our claims are against them, which we've done, then referring to them collectively in other places of the complaint is permissible. But in the other places where you refer to them collectively you're alleging other acts. We're alleging joint actions by them. That's correct. So to say... Why is that adequate just because there are specific allegations of different acts? Why do the group allegations become permissible when they would otherwise be impermissible? Well, it's not that they're otherwise... Insufficient, I guess I should say. Well, it's not that they're otherwise insufficient. Alright. I'm not tracking your point. Go ahead. Explain it more if you would. I think basically what it boils down to is what Twombly requires is that you have to have enough specific information against each defendant to put them on notice of the claim. We've done that. And so where we refer to their actions collectively if you look at the complaint as a whole, that's not impermissible to refer to their collective actions collectively. So to say that they agreed to boycott the e-commerce platforms is not a impermissible group pleading because our complaint also states that these defendants took these actions to boycott the e-commerce platforms. And that makes sense in the idea that if there's already an adequate allegation against them individually that indicates some acting in concert and it's pled with sufficient specificity, then that group conduct piece is just fine. But if it's a completely and separate different sort of claim and it doesn't tie to the other factual allegations, isn't that insufficient at that point? I think that might be insufficient, but the difference here is that we have tied those specific allegations together with the general allegations, which would be permissible. In applying the summary judgment standard, the lower court also erred by accepting the defendant's alternative explanations. For example, the lower court found that it was not surprising that CHS would send a letter to Farmers discouraging use of the e-commerce platforms. The lower court also found that Bayer forming the task force was innocuous behavior. At the pleading stage, this is improper and it's for the jury to decide which inferences are more plausible. In conclusion, the lower court broke the complaint apart and missed the story it told as a whole. One of a coordinated industry effort to choke off a disruptive rival. By applying the wrong standard, it dismissed a plausible antitrust conspiracy before discovery, shutting the courthouse door on Farmers who've been paying the price. We asked this court to correct that error so the case can proceed to the merits, where we can prove what the pleadings already plausibly show. Defendants acted together to block competition and preserve their margins at the expense of transparency and choice. Thank you for your argument. Ms. Rosenberg, we'll hear from you. You may proceed. Good morning, Your Honors. Sharon Rosenberg for Defendants Bear Crop Science, Inc. and Bear Crop Science, L.P. and arguing today on behalf of all defendants. Now the heart of plaintiff's alleged conspiracy is alleged inaction in the form of a failure to supply by 16 defendants across three distribution levels at unspecified times over the course of years. And in particular, of course, plaintiffs allege a failure to supply crop inputs to e-commerce platforms beginning at least as early as January 1, 2014. And while they have backtracked a little bit from that in their briefing, the fact is that timeline is stated at paragraph 144 of their complaint. Now because plaintiffs don't allege direct evidence of an agreement, to survive a 12B6 motion, they must allege facts, not conclusions, from which a preceding agreement can be plausibly inferred. Now the first step in evaluating whether they've met that pleading burden, even before thinking about the overall picture of plausibility, is to parse out the factual allegations from the conclusory allegations. Because, of course, conclusory allegations are not entitled to the presumption of truth. Now the nub of plaintiffs' alleged conspiracy, where they suggest that they've grouped all defendants together and stated a joint boycott as the, quote, parallel conduct for all defendants, is paragraph 96. And paragraph 96 has two parts. The first part is that defendants, quote, agreed to cut off supply and to initiate a joint boycott. The second part of paragraph 96 is that e-commerce platforms came calling and requested crop inputs, and all defendants, grouped together, refused and offered only pretextual excuses. Now that first part of paragraph 96 simply mirrors exactly what was rejected in Twombly as conclusory. So here it's agreed to cut off supply. In Twombly it was agreed not to compete with one another. The second part of paragraph 96 is equally conclusory. And for that, I would direct your honors to this Court's decision in Insolite. And I'd invite you to focus on what's not in paragraph 96, which is there's nothing about the when any of this occurred between 2014 and 2021. And there's nothing about which defendants refused supply, much less which platforms came asking. With respect to the failure to allege the when part, Insolite, quoting Twombly, characterizes conclusory allegations that don't include the when of the alleged agreement or the alleged conduct. And in that same paragraph, Insolite cited the Second Circuit's decision in Ray Elevator antitrust litigation. In a parenthetical that said that where a complaint generally recounts antitrust violations, and I'm quoting here, without any specification of any particular activities by any particular defendant, it is nothing more than a list of theoretical possibilities which one could postulate without knowing any facts whatsoever. That describes paragraph 96 to a T. If so little were enough to allege parallel conduct, it makes no sense that more was found wanting in this Court's Park Airmat decision. And indeed, every plaintiff would simply elect to stick to conclusions and conclusory group pleading to establish parallel conduct in order to skip ahead to the plus factor part of the analysis. Now, that's paragraph 96, and I think as Judge Scolaton and Judge Erickson, you all picked up on in your questions, it may be okay to use group pleading referring to all defendants when it's a shorthand for conduct you've already alleged. When you're using it as a substitute for allegations that would cite each defendant to conspiracy, that's when it's impermissible. Now, I do want to address the Canadian... Why is it impermissible? Our Court hasn't really addressed this point, as I understand it, and you cite maybe one circuit. There's not a lot of law, as I understand it, on the point. Why doesn't a group allegation mean that we're alleging that companies A, B, C, and D each did the following things? So, I will certainly agree with you, Judge Colaton, that the A circuit hasn't spoken clearly on it. I do think in Insolite, the Court gets close in its reference to Inway Elevator, which is a second circuit decision, but it doesn't clearly, excuse me, speak in terms of group pleading. I will say, though, in terms of other circuits, it's certainly more than one circuit. The fourth circuit in SD3 v. Black & Decker, plaintiff's favorite case, comes out clearly against group pleading. In fact, it dismissed almost half of the defendants there. The second circuit in Inway Elevator and City of Pontiac, the sixth circuit in Total Benefits, the third circuit in Birch. So, it certainly, I believe, is a majority view, but you are certainly correct. The A circuit has not spoken clearly on the subject. If we look at what's required on that group pleading, if it raises something that has not specifically been pled against the other individual allegations earlier in the complaint, or subsequent, I guess, somewhere else in the complaint, that if you don't allege a factual scenario that kind of tells us who did what, when, and if relevant, where, if you don't do that, is it merely conclusory and insufficient in your view? Yes, Your Honor, and in fact, the way I would answer that question is I would direct you to plaintiff's own cases. So again, SD3, which is the case that they cite most, in SD3, what the court said is that there were detailed allegations that formed the heart of the complaint. And I'm quoting here, they described a particular meeting on a particular day with particular participants making a particular agreement. That's plaintiff's case. Anderson News, out of the Second Circuit, also plaintiff's case. This goes further back in time. It's older than City of Pontiac or Mayor of Baltimore. The complaint there alleged not just that all defendants ceased in virtual lockstep to deal with Anderson, but alleges that on various executives, 10 of whose names or positions are specified, had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement. I would also direct, Your Honors, to Propane Tank. That, of course, is the Eighth Circuit decision that plaintiffs rely on most extensively, and they rely on it for the supposed sufficiency of their audit allegations. In Propane Tank, there's actually a direct evidence case, not an indirect evidence case. So what plaintiffs, the direct purchasers, alleged was that there were seven calls over the course of two days where specifically named executives agreed to decrease the volume in the Propane Tank, the Propane Tank agreement that had to be plausibly inferred there. But even as to what was ultimately inferred, which was not a proceeding agreement, but rather a continuing violation into 2010, plaintiffs in their brief at page 25 compare their generic allegations to some of the more generic allegations in Propane Tank. And in particular, they quote an allegation from Propane Tank that through 2010, defendants regularly communicated to monitor compliance. Well, the Propane Tank, what they said was it took that paragraph, which was paragraph 92 of the direct purchaser complaint, and some other generic allegations described those. Then it went on to say more specifically plaintiffs alleged, and then it went on to more specific allegations, and then referred back to all of them and said some of what we just referred to, some of those are naked assertions devoid of factual enhancement, clearly referring to the generic allegations that plaintiffs themselves compare their own allegations to. The panel, then the indirect purchaser case in 2018 followed up on that, and again described the generic allegations in the direct purchaser case that were deemed insufficient, and again, naked assertions devoid of factual enhancement. So plaintiffs own cases suggest that what they have alleged is not enough. I'll also point out, so what plaintiffs do allege as defendants, we've talked about paragraph 96, the classically conclusory allegation. They then have a handful of very disparate allegations as to a few defendants here and there. But maybe it's just as important to point out what plaintiffs don't allege. So if you disregard the Canadian conduct, which plaintiffs on page 23 of the reply concede is not about defendants, with the sole exception of Canadian defendant federated. They say we're not lumping defendants together with their Canadian counterparts. We're merely suggesting that it's possible that the US defendants engaged in misconduct if Canadian counterparts did as well. That's, again, page 23 of the reply. So once you disregard the fact that the Canadian allegations are about non-defendants, you have three defendants who are completely unnamed in this complaint outside of the paragraph introducing them. And that's Cargill, Univar, and Pioneer. You have another six defendants where the only allegation against them is trade association membership, which Twombly in its footnote 12 says is not anything from which an inference can be drawn. Again, trade association membership. And that's Simplot, Winfield, Nutrien, the two Gromark defendants, and Tencost. And what's left in terms of the disparate conduct by not just various defendants and unconnected and unsimilar, but years apart in time from the supposed conspiracy that began in 2014, together those can't supply the factual context to suggest agreement among 16 defendants at three levels. I would invite this court actually, so I've pointed to some cases that I think are like plaintiffs where the courts dismissed. You know, Park-Earmat being a classic example of that, where actually much more was alleged in terms of what defendants did in parallel conduct was found insufficiently pled. I've pointed this court to cases cited by plaintiffs that they themselves compare their own allegations to. And in fact, either the allegations were found wanting, as in Propane Tank where they were naked assertions, or where much more was alleged, as in the Fourth Circuit's SD3. But now I'd actually invite the court to compare plaintiff's allegations to what the Supreme Court in Twombly lays out, and this is in footnote four, as actually plausibly suggesting a proceeding agreement. And what the Twombly court says is it looks at affirmative conduct and there the affirmative conduct that they're describing as hypothetical was a change in pricing structure. Affirmative conduct that was historically unprecedented, that occurred at the very same time, those are the court's words, and for no other discernible reason than an agreement. I would ask you to compare that to what's alleged here is inaction that maintained the status quo, not inviting in market disruptors, that happened over the course of at least five years from 2014 to 2018, although actually probably longer since plaintiffs allege it continued through present and filed in 2021, and for which there are readily apparent other explanations. When I say readily apparent other explanations, I point you to two sources. I point you, one, to plaintiff's own complaint. Their allegations, paragraph 71, about doing business with these new e-commerce platforms with lower profits, and Ms. Aldridge referred again to that in her argument here about price opacity and market disruptors, and in some of your questions you raised that. I point you to paragraph 116 of plaintiff's complaint, where they allege that defendants were all going to have their own e-commerce platforms, so it wasn't just a question of disintermediation or lower profits, but actually a case of these e-commerce platforms being either competitors or potential competitors of each and every defendant. So that's plaintiff's allegations. I also, of course, point you to common economic experience. When you state a claim with indirect evidence of an agreement, a plaintiff must offer facts in a context that suggests agreement, and that context, according to Twombly, is informed by two things. One, non-conclusory factual allegations in plaintiff's complaint, but also, according to the Supreme Court, common economic experience. And so it was common economic experience that the Supreme Court looked to when discussing the plus factors that were alleged in Twombly, which included, but weren't limited to, a common motive to conspire and actions against economic self-interest. And what the Court said as to those in the discussion of the common motive plus factor, it said that resisting competition is routine market behavior, and that there's no reason to infer an agreement from companies doing what is natural in any case. And looking at the separate plus factor there of action against economic self-interest, and this was declining to anything, it teaches us that there's an obvious alternative explanation for companies wanting to maintain the status quo. And that is simply that they liked the world the way it was. So too here. So even if plaintiffs had adequately alleged parallel conduct, which of course they don't, and that's the basis of the District Court's holding, there's nothing in plaintiff's allegations that would suggest a proceeding agreement. And that's again taking into account their own non-conclusory factual allegations, but also common economic experience. I think in evaluating whether a conspiracy was sufficiently alleged here, I would ask this Court to look at the policy but also in this Court's insolent decision. And the way that the insolent Court phrased it was that courts must be reasonably aggressive in weeding out meritless antitrust claims at the start. And the way it was described in Trombley was that the reason for why courts must be able to insist on some specificity in pleading. And the reason discussed in both of those cases was that the cost of discovery in antitrust cases is massive. It's frankly not like other cases and it becomes the point where even anemic allegations can become extortionary given the high cost. That's one policy consideration. The second policy consideration is really a doctrinal one, which is that antitrust doctrine limits what inferences can be drawn from what allegations. And so part of that is the Supreme Court's discussion of obvious alternative explanations. Part of it is actually in the insolent decision, the Eighth Circuit focused on the Colgate Doctrine. And what inferences are we going to draw from similarly businesses in the same market? And Judge Erickson, your question about a 95% concentrated market, that factors might react the same to common economic stimuli. Court after court recognizes that. And so that's why, again, in the antitrust conduct, we're not simply going to draw inferences from defendants not doing business with the new market disruptor. Wouldn't we be running counter to the Supreme Court if we insisted on specificity? Because after Twombly, they summarily reversed that Erickson against Pardis case and cited back to Swartkowitz and said we're sticking with Swartkowitz. So wouldn't we be in trouble if we said the complaint is insufficient because it isn't specific? I would say no to that, Your Honor, and I say that for two reasons. One is the line of specific and nonspecific, again, you can't be totally nonspecific, but again, courts can't be too onerous and require too much specificity. It's just a question of a line. And again, there's language in Twombly which is actually quoting Associated General Contractors, which says that a district court must be able to insist on some specificity in planning. So it's really just a question of how much. I mean, certainly you're right. Erickson would suggest you can't be too specific. The second is the specific concerns of the antitrust context. I would also say that what Twombly itself characterizes as conclusory is instructive, as well as how the Supreme Court in Ashcroft v. Iqbal described what the court in Twombly did. So what the Iqbal court described about Twombly is not just going on in detail about how if the conclusory allegations had been credited in Twombly, they would have stated a claim. In fact, the whole one thing Twombly points out is if you accept every allegation or you make it too easy to plead, then pleading a conspiracy would be a, quote, sure thing, because you would just take market factors. And again, this goes back to the language I quoted earlier, that insolent quotes from the elevator decision about, well, you know, really what you're doing at that point is talking about theoretical possibilities. And that can't possibly be enough. I see that I'm out of time. I would ask your honors to affirm the district court's decision, including its dismissal with prejudice, as plaintiffs never sought leave to imagine. Thank you. All right. Thank you for your argument. We'll hear rebuttal, if you wish, Ms. Aldridge. So the first thing I want to address on rebuttal is the defendants say that we argue no specific allegations about the refusal to supply e-commerce platforms. But if you look at paragraph 108 of the complaint, we make very specific allegations that in 2018, when FBN purchased Yorkton distributors, Bayer, Syngenta, Basif, Corteva, and Winfield abruptly canceled their agreements with Yorkton. Now, this may have happened in Canada, but that's still relevant to show, to enhance the plausibility of those allegations in our complaint. And also, the co-founder of FBN himself said that the actions that the industry took in Canada were the same that they did in the United States. So if you look at those allegations, we have them that the defendants did actually cut off the supply to the e-commerce platforms. There are no allegations, even in a general nature, against the other 11 defendants. Does that matter? Right? So what you've got five people, let's say you're right. These five people, the five defendants acted in concert, and you can draw an inference from what happened up in Canada. You still have these other 11 people there that you've got no specific allegations at all. And the question of specificity, I think, is one of line drawing. And the question kind of becomes is, when is sufficient notice given to a particular defendant? What are the claims that are being asserted against them? Well, I think that we do have specific allegations against the other 11 defendants. As I mentioned when I came up here earlier, I think that the defendants identified Cargill, Univar, and Pioneer as not having any specific allegations. But Univar sent out a letter claiming that you could equate FBN with socialism if they were allowed to enter the market. I think Cargill also cuts off FBN from the market. And Pioneer, the Canadian Competition Bureau, requested that they produce information relative to that investigation. And so if you take all of these together, while they may not be specific allegations that they cut off FBN like we have with those five, if you look at it as a whole and compare it with the plus factors in conjunction with the plus factors, I should say, there is a plausible inference that these defendants had an agreement to cut FBN out of the market. And the defendants also pointed out a few cases that I just want to briefly distinguish here. In Park-Earmat, there was only two alleged co-conspirators in that case. One affirmatively let Park-Earmat participate in the mail order pharmacy. One let them participate. One did not let them participate. And so those actions are so contradictory as to not really be relevant to this case where our allegations are that they all acted similarly in boycotting the e-commerce platforms. Pontiac Police is distinguishable here because the parallel conduct in that case was inconsequential market chatter that largely happened outside of the class period. And here we allege that this all happened between 2014 and 2018. As I mentioned earlier, the conduct tracked the rise of FBN's rise to success in the market. And then for Elevator, we allege specific facts of a U.S. boycott, which I mentioned to you all earlier, which are similar to the actions in Canada and are relevant to show the defendants' actions in the United States. And finally, because I'm running out of time, but I just want to remind this court, which you all know very well, is that the courts must be very careful not to embellish Twombly. Twombly requires a short and plain statement to put the defendants on notice of what the claims against them are, and that's what we've done here. And we would ask that the court reverse and find that the complaint plausibly suggests a conspiracy to boycott e-commerce platforms. Thank you. Thank you for your argument. Thank you to both counsel. The case is submitted and the court will file a decision in due course.